Richard E. LAKE, Jr., an inmate of Atmore State Prison, on behalf of himself and others similarly situated, Plaintiffs,

v.

Frank LEE, Commissioner of the Alabama State Board of Corrections, et al., Defendants.

Richard E. LAKE, Jr., Petitioner,

v.

A. Frank LEE, etc., Respondent.

Lee Henry COMER, Petitioner,

v.

ALABAMA PENAL SYSTEM, etc., Respondent.

Enoch DICKINSON, Jr., Petitioner,

v.

Alexander Frank LEE, Respondent.

Enoch DICKINSON, Jr., Petitioner,

v.

WARDEN OF KILBY PRISON, Respondent.

Civ. A. Nos. 5532–69, 5563–69, 5582–69, 5650–69 and 5796–69.

United States District Court, S. D. Alabama, S. D.

June 30, 1971.

U. W. Clemon, Birmingham, Ala., A. J. Cooper, Jr., Mobile, Ala., for plaintiffs and petitioners.

Paul T. Gish, Jr., Asst. Atty. Gen., Robert B. Stewart, D. Coleman Yarbrough, Montgomery, Ala., for defendants and respondents.

## OPINION AND ORDER

PITTMAN, District Judge.

■ The petitions in this cause are treated as complaints filed pursuant to 42 U.S.C.A. Section 1983 seeking declaratory and injunctive relief on behalf of these black citizens, and on behalf of other persons similarly situated, pursuant to Rule 23(a) of the Federal Rules of Civil Procedure. The plaintiffs seek a declaration that they are incarcerated under conditions so base as to constitute cruel and unusual punishment in contravention of the Eighth Amendment to the Constitution of the United States. While the nominal plaintiffs are all incarcerated at the new Holman Prison, Atmore, Alabama, each plaintiff has shown past use of the Atmore State Prison facilities, and a reasonable expectation of future use. Consequently, all are deemed to have standing to challenge conditions and practices at both penal institutions. Singleton v. Board of Commissioners, 356 F.2d 771 (5th Cir. 1966).

The contentions of the plaintiffs may be categorized as relating to:

I. Poor condition of physical plant in segregation [1] and punitive isolation [2] units.

(A) Segregation unit:

(1) Lack of heat

(2) Ventilation lowers temperature unduly

(3) Infestation by rats, roaches and vermin

(4) Certain management policies tending to enhance these physical shortcomings

(a) Ventilation fans run in early morning

(b) Ventilation fans run at shower time

(c) Clothing insufficient against cold

(d) Bed clothing insufficient against cold

(e) Medical attention inadequate

(f) Inmate cleanliness insufficient

(g) Access to exercise, fresh air and sunlight insufficient

(h) Inmate Leroy Hall contracted fatal case of pneumonia as a result of these conditions.

(B) Punitive isolation unit:

(1) Insufficient heat

(2) Insufficient light

(3) Insufficient medical attention

(4) Insufficient personal hygenic supplies

(5) Insufficient food

(6) Unsanitary food

(7) Proximity of toilet and drinking facilities.

II. Arbitrary and capricious administrative policies:

(A) Interference with mail

(1) Censorship of mail to attorneys

(2) Obstructing correspondence with relatives and friends

(B) Prohibition of educational materials

(C) Prohibition of information on current events

(D) Prohibition of photographs of relatives and friends

(E) Curtailment of visiting privileges

(F) Inadequate diet

(G) Inadequate sanitary treatment of food

(H) Requirement of short haircuts

(I) Arbitrary taking of accumulated "good time."

III. Brutality of guards:

(A) Dickinson beaten by Officer English

---

1. The term "segregation", as it appears herein, refers to a maximum security oriented exclusion from the general population of the prison.

2. "Punitive isolation" is commonly known as "solitary confinement."

(B) Dickinson kicked and stomped by Officer Riley Hall

(C) Dickinson confined by Officer Digman without medication subsequent to beating by Officers English and Lee

(D) Lake attacked by Officer Willie Frank Hall while confined in the infirmary

(E) Chemical MACE sprayed into Lake's cell in punitive isolation unit by unknown guard.

(F) Lake's ring, radios, shirts and books confiscated on January 15, 1969. Books were donated to prison library. All other items presumably kept by guards.

IV. Brutality of "trusties" or "special inmates."

(A) Frank Felder killed William Knowles

(B) Jack Hunter stabbed Israel Bellamy

(C) Shield Scruggs assaulted Richard Lake with a hoe

(D) Joe Douglas, Joe Sidney and Louis Clark beat Richard Lake unconscious with clubs

(E) Trusties engage in homosexual attacks with cooperation of the guards.

V. Racial discrimination:

(A) Policy of racial segregation in segregation unit.

(B) Inmate work assignments discriminatory

(C) Blacks are not employed on the prison staff.

By its order of June 1, 1970, the court consolidated Civil Actions Nos. 5532–69, 5563–69, 5582–69, 5650–69, and 5796–69 filed by petitioners Richard E. Lake, Lee Henry Comer and Enoch Dickinson, Jr. These petitions contained numerous allegations, some of which, if found to be true, present questions of cruel and unusual punishment, violations of the First Amendment, due process in Fifth and Fourteenth Amendments, and equal protection in Fourteenth Amendment. A hearing, which lasted five days, was conducted as to the merits of those allegations beyond the scope of Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), and Beard v. Lee, an unpublished opinion rendered by this court on January 24, 1969.

Washington v. Lee, supra, governs racial desegregation as it pertains to inmates in the place of incarceration. Beard v. Lee relates to conditions in the punitive isolation unit (solitary confinement), and requires that:

1. Inmates in punitive isolation be allowed to wash their hands at mid-morning and prior to eating their meal.

2. Inmates in punitive isolation be furnished adequate toilet paper.

3. Drinking water will be furnished a minimum of three times per day.

4. Inmates in punitive isolation will be furnished shirt and pants or a set of coveralls and cloth slides.

5. Meals will be fed on paper plates with plastic spoons.

6. The number of persons per cell in isolation and in the holding unit is not to exceed eight.

7. Medical attention will be available whenever needed and the doctor will visit the unit at least once every three days.

8. All inmates in punitive isolation will be served one full meal per day, except under extraordinary circumstances.

9. Each inmate will be given one blanket.

10. The lights will be left on a minimum of eight and a maximum of sixteen hours per day.

11. The punitive isolation cells will be adequately ventilated, appropriately heated, and maintained in a sanitary condition at all times.

12. All toilets in punitive isolation will be flushed a minimum of three times a day.

Additionally, the defendants have agreed to alter certain of their adminis-

trative policies which have given rise to inmate complaints.

The defendants agree to be, and are hereby enjoined from failing to do the following:

(1) Inmates in punitive isolation are to be given an opportunity to exercise outside the building in open air for not less than one hour and not less than once each eleven (11) days, weather permitting; if the weather is inclement, they will be allowed to exercise in a suitable area inside the building.

(2) All prison inmates not in segregation or punitive isolation may be allowed the use of the facilities for religious worship at least once a week. There shall be free and unrestricted use of religious literature regardless of faith or creed.

(3) Mail to and from any attorney at law, licensed to practice in the State of Alabama, will not be opened except where there is reasonable cause to believe sealed communications are enclosed.

(4) Mail to and from public officials is not to be opened.

(5) While all other *outgoing and incoming* mail may be opened and read, there is to be no deletion except for reasons of prison security, drugs, and hardcore pornography and obscenity, which will be judged in accordance with *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and *A Book named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

Highly inflammatory writing which could affect prison security may be deleted from *incoming* mail. But, criticism of the institutions, its personnel, or public officials is not to be deleted from any outgoing mail.

(6) The free flow of magazines, books, newspapers, etc., is to be permitted and there shall be no deletions except for reasons of prison security, *including highly* inflammatory writings, and no censorship for obscenity except under *Roth* and *Memoirs,* supra, subject to reasonable limitations of such materials in segregation and punitive isolation.

(7) Inmates in segregation are to be given an opportunity to bathe not less than twice a week with the free use of hot and cold water; but, the prison personnel may operate the on and off controls.

(8) Inmates in punitive isolation are to be given an opportunity to bathe not less than once each week with the free use of hot and cold water; but, prison personnel may operate the on and off controls. Inmates are to have daily access to materials for brushing or cleaning their teeth.

(9) Before a hearing is held on any charge wherein credit for good time can be deprived an inmate, the inmate is to be given written notice not less than 24 hours before the hearing; and, if he cannot read, the notice and charge are to be read to him. The inmate must be given an opportunity and reasonable time in which to speak in his own behalf and he must be allowed to see all exhibits and hear all oral testimony presented against him.

(10) Before a hearing is held in which an inmate may be placed in segregation or punitive isolation as punishment he is to be given written notice of the charge a reasonable time before the hearing. If he cannot read, it is to be read to him before the hearing. He must in every instance at the hearing be allowed to speak a reasonable length of time in his own behalf and hear all oral testimony and see any exhibits presented against him.

(11) All hearings which may result in segregation or punitive isolation as punishment are to be held promptly subject to reasonable delays which may be occasioned by reasons of prison security.

(12) No inmate is to be armed or permitted to keep or carry weapons by prison officials inside the enclosures of the respective institutions.

(13) Inmates not in segregation or punitive isolation are to be given an opportunity to exchange clothes not less

than two times each week and linens not less than one time each week.

(14) An exchange of clothing and linens are to be made available to those in segregation and punitive isolation not less than once a week.

(15) Prohibit taking of good time from those in segregation for their own protection.

There was an absence of proof on the plaintiffs' claims that they were prohibited from keeping photographs of their family and friends and that their visiting privileges were curtailed. Also, there was inadequate proof to substantiate the claim that prison officials act discriminatorily in assigning work details to prisoners or in hiring prison staff.

After eliminating these issues and those covered by the *Washington* and *Beard* decrees and the consent injunction already set out, only the following matters are left for this court's determination:

I. Poor condition of the facilities in the segregation unit
   (A) Lack of heat
   (B) Ventilation lowers temperature unduly
   (C) Infestation by rats, roaches and vermin
   (D) Certain management policies tending to enhance these physical shortcomings
   (1) Ventilation fans run in early morning
   (2) Ventilation fans run at shower time
   (3) Clothing insufficient against cold
   (4) Bed clothing insufficient against cold
   (5) Medical attention inadequate
   (6) Inmate Leroy Hall contracted fatal case of pneumonia as a result of these conditions.

II. Arbitrary and capricious administrative policies:
   (A) Inadequate sanitary treatment of food
   (B) Requirement of short haircuts

III. Brutality of guards:
   (A) Dickinson beaten by Officer English
   (B) Dickinson kicked and stomped by Officer Riley Hall.
   (C) Dickinson confined by Officer Digman without medication subsequent to beating by Officers English and Lee
   (D) Lake attacked by Officer Willie Frank Hall while confined in the infirmary
   (E) Chemical MACE sprayed into Lake's cell in punitive isolation unit by unknown guard.
   (F) Lake's ring, radios, shirts and books confiscated on January 15, 1969. Books were donated to prison library. All other items presumably kept by guards.

IV. Brutality of "trusties" or "special inmates."
   (A) Frank Felder killed William Knowles
   (B) Jack Hunter stabbed Israel Bellamy
   (C) Shield Scruggs assaulted Richard Lake with a hoe.
   (D) Joe Douglas, Joe Sidney and Louis Clark beat Richard Lake unconscious with clubs
   (E) Trusties engage in homosexual attacks with cooperation of the guards

FINDINGS OF FACT

■ In addition to the evidentiary hearing of this cause which lasted five days, and in order to supplement the evidence at the hearing, the court, accompanied by attorneys representing all parties, conducted a surprise (unannounced to any party) walk-through inspection of both Holman and Atmore State prisons. The inspection occupied the major portion of the working day, March 26, 1971.

At the Atmore State Prison, the court inspected all living quarters, including restroom facilities and showers. The

court also inspected the dining room, kitchen, food storage rooms, assembly rooms, infirmary, medical aid station (where sick call is conducted daily), laundry, workshops—literally the entire plant. Atmore was erected in 1928. Considering the age of the building, the court found it reasonably clean with no evidence of accumulated grime or dirt in any of the areas. Apparently due to the age of the plumbing, several faucets were running continually. This condition existed both in dormitory restrooms and in the individual basins located within the segregation unit. There was evidence that the upper inside of a few urinals and toilets had not been properly cleaned. The task of cleaning toilet facilities is assigned to the inmates supervised by guards. Heating seemed generally adequate, although the circulation of warm air in the segregation unit at Atmore was uneven.

A similar inspection of the Holman institution included all restroom facilities, the segregation unit, punitive isolation unit, death row, kitchen, food storage, dining room, and many of the dormitories. Holman, which was first occupied in December, 1969, was obviously easy to maintain and was clean and satisfactory in all physical aspects observed by the court.

Prison officials admit intermittent problems with mice, roaches, etc. However, regular extermination service is rendered by a private concern under contract with the State. The court saw no evidence of insect or rodent activity.

Inmates have complained of ventilation fans being run in the early morning hours, and during shower time. The court finds that the fans are operated in a manner which does not constitute harassment.[3]

During its walk-through inspection, the court made frequent spot checks of clothing and bed clothing. The quality of both leaves much to be desired. Yet, considering its apparent age and initial quality, it was relatively clean. The deficiencies do not rise to constitutional proportions.

At the time of the hearings, and during the period relevant to the testimony, Dr. Thomas was employed as the prison physician.[3a] Dr. Thomas devoted six mornings weekly to the prison population, treating an average of forty to forty-five patients daily. Afternoons were devoted to his private practice in Escambia County, Alabama, but he remained "on call" for prison emergencies twenty-four hours per day. In addition, the doctor had an inmate medical assistant at each institution. One, a Navy medical corpsman for twenty-five years, has served at the prison for approximately eight years. The other, an Army medical corpsman for two and one-half years, has served at the prison almost two years. The doctor performed minor surgery for the total prison population of approximately 1,900 men. Major surgery and intensive care are performed or provided at the state penal institution located at Mt. Meigs, Alabama, 165 miles from Atmore. Emergency cases are sent to the public hospital in Atmore, Alabama, a distance of ten miles.

Only the most rudimentary comparisons can be drawn between medical attention available at the Holman-Atmore complex, and that available to citizens generally. The prison population is approximately 1,900. In 1967 the ratio of doctors to units of population was 1:1230 in the State of Alabama, and 1:615 for the nation at large.[4] These statistics should be weighted unfavorably to the prison by (1) the fact that Dr. Thomas

---

3. Petitioners allege that inmate Leroy Hall died of pneumonia as a result of inadequate heat, clothing, and medical attention. Medical testimony, however, indicates that Hall died from severe asthma and acute thrombosis.

3a. He has recently resigned and it is expected that adequate medical attention commensurate with that provided in the past will be provided.

4. Statistical Abstract of the United States, United States Department of Commerce (1969).

was not employed full time, and by (2) the greater number of psychosomatic complaints which are common within a prison population and is not uncommon to the military services. Other factors must be weighted as being favorable to the prison: (1) the support roles of the Mt. Meigs facility and the public hospital in Atmore, (2) the less efficient distributive concentration of doctors practicing within narrow specialties among the civilian population, and (3) the services of the two medical assistants who apparently perform services comparable to "paramedical" personnel currently gaining acceptance within the medical profession.

The court will attempt no comparative evaluation of the medical services available at the Atmore-Holman complex. It is considered, however, that any existing deficiencies do not rise to constitutional proportions.

The defendants have agreed to be and are herein enjoined as to all those prison policies alleged to be capricious except for the regulations prohibiting long or bushy hair and the methods of serving food. As to the latter, the court is of the opinion that the prison diet is adequate, as are the methods of food service within the limitations of existing facilities.

■ As to the defendants' regulation of hair styles, the court noted during the hearing, and on its inspection tour, that the majority of the inmates wore their hair at that length considered normal immediately prior to the lengthy fashion of today. However, several black inmates wore their hair in a moderately bushy, modified "Afro" or "natural" hair style. Such a policy in no way, reasonably viewed, causes discomfort, humiliation or loss of identity. Of greater weight are the considerations of sanitation and security advanced by the defendants, the latter purpose prevents an escapee from drastically altering his appearance by styling or cutting long hair. This is a rational basis for the rule which is appropriate and reasonable. The rule has not been applied arbitrarily nor was it founded or applied on a racial basis.[4a] The only contrary evidence involved petitioners Lake and Comer who appeared initially in court with moderately bushy hair, but at their last appearance had "GI" or short haircuts, allegedly imposed against their will. Defendants admitted ordering a trim of the sides of petitioners' heads following a previous appearance in court. Petitioner Dickinson consented, but Lake and Comer, becoming vexed at the barber, requested that all their hair be cut off. Dickinson's appearances in court with a full head of hair, written reports at the time of the incident, and the credibility of the witnesses tend to corroborate the contention of the defendants.

The three petitioners, Lake, Comer and Dickinson, complain of a series of beatings at the hands of guards and certain trusties under the supervision of guards. They also testified to beatings inflicted upon fellow inmates. In each instance the defendants have rebutted petitioners' testimony with evidence tending to minimize the alleged violence and to show whatever force used was reasonable under the circumstances. Generally, the use of force by guards was shown to arise out of the inmates' forceful refusal to obey and conform to institutional discipline.

The court deplores any occurrence of violence by petitioner inmates, other inmates or prison personnel. The court is also mindful of the security problems faced by prison personnel. An illustrative example of this security problem manifested itself during the court's inspection tour of Holman prison. An inmate apparently observed the method of spot checking the quality of bedding, involving partial removal of bed clothing to expose the mattress. The inmate, apparently fearing discovery of his

4a. Stevenson v. Bd. of Ed. of Wheeler Co., Ga., 426 F.2d 1154 (5th Cir. 1970); Ferrell v. Dallas Independent School District, 392 F.2d 697 (5th Cir. 1968); Griffin v. Tatum, 425 F.2d 201 (5th Cir. 1970).

caché, and within a few feet of the court, was observed in an attempt to remove and conceal two ten-inch metal stakes, one sharpened into a knife or dagger, which apparently had been secreted in his bedding or its immediate vicinity. Earlier that week a guard had been fatally stabbed by an inmate at Holman.

During the evidentiary hearing in Mobile, and in the courtroom, petitioner Lake violently jerked away, pushed and struck at a United States Deputy Marshal attempting to escort petitioner from the courtroom at the day's end. Immediately thereafter, Lake created a commotion in the hallways connecting the courtroom and Marshal's office while being escorted between the two. Prison personnel must be free to deal firmly with such outbreaks as they arise in order to maintain order, discipline, security of inmates and prison personnel, and to quell potential large scale violence.

Hearing and evaluating testimony in litigation such as the case sub judice is rendered even more difficult than usual by the extreme polarization of the parties, the highly defensive attitude of many of the guards, the apparent willingness of many inmates to testify to facts beyond their personal knowledge, or upon the basis of mere impressions, or to distort and testify falsely. The criminal records [5] of the inmates, involving as all do, varying numbers of crimes of moral turpitude, their demeanor and attitude while in court and on the witness stand, shadows the credibility of their testimony. It is the judgment and conclusion of the court that the petitioners have distorted, warped, exaggerated, and misrepresented many facts. By and large, some of them would do or say whatever they felt necessary to obtain their release, and short of this, to have their way. In the absence of corroborating evidence their testimony must be viewed with utmost caution. In this regard, the visual inspection of the institutions revealed the physical plant to be in much better condition than that testified by the petitioners.

The evidence is in a similar posture as it pertains to petitioners' allegations of enforced homosexuality within the dark world of "Bo", "Big Jim", "Baby Chili", "Zoot Suit", "Georgia Anne", and "Honey Hush". Here the petitioners have alleged concerted action between guards and trusties dealing in weapons, illicit drugs and forcible homosexual rape. The prison officials have testified to their awareness of these prob-

---

5. Richard E. Lake is now serving a ten year sentence for robbery. His prior record includes a six month sentence for assault and battery, and a three year sentence for assault with intent to rob.

Lee Henry Comer is currently serving ten years for rape.

Enoch Dickinson, Jr. is currently serving eight years for forgery. His prior record includes a one year sentence for forgery, an eight year sentence for burglary, an eighteen month sentence for burglary, and a two year sentence for threatening communication.

Al Varner is currently serving eight years for assault with intent to murder. He was previously convicted of assault with intent to murder, for which he served two years.

Dallas Hutchison is currently serving ten years for robbery. His prior record includes a one year sentence for burglary, and a two year sentence for assault with intent to murder.

Edward Dickerson is currently serving ten years for first degree manslaughter.

William Turk is currently serving fifteen years for burglary.

Crissie Dickinson is currently serving eight years for burglary.

Bobby Segars is currently serving 100 years for robbery. Previously he served six years for grand larceny.

Samuel Streeter is currently serving fifty years for second degree murder. His prior record includes an eighteen month sentence for grand larceny.

Willie J. Hill is serving a four year sentence for receiving stolen property.

Otis Stephens is serving a twenty year sentence for assault with intent to murder. His prior convictions include burglary and grand larceny.

Jerome Lowe is serving a ten year sentence for robbery.

McArthur Harris is serving twelve years pursuant to convictions of murder and burglary.

lems, but deny collaboration or acquiescence. Defendants further testified that cell assignments were made by high echelon prison authorities in compliance with the mandate of Washington v. Lee, and not by individual guards favoring trusties desirous of a homosexual relationship with the inmate assigned to a given cell. It is the court's conclusion these problems are not uncommon to prison populations, and in this instance, much more likely to be the result of the inmates own initiative than that of the defendants.

On January 15, 1969, a riot broke out in the segregation unit at Atmore State Prison. The guard on duty was overpowered. The beatings alleged by petitioners during the riot are more correctly described as reasonable force by the prison guards to restore order and overcome or subdue force initiated by inmates in segregation and members of the plaintiffs' class which was aided and abetted by petitioner Lake. Two inmates were killed. The defendants have testified that both inmates were dead or dying by the time the guards fought their way into the cell block. Petitioners introduced testimony to the effect that the deceased, Glen Dickinson, was fatally stabbed by Joe "Zoot Suit" Douglas, a trusty, and that the deceased, Frank Felder, was shot by the late N. L. Hale, acting warden. The coroner's report disclosed, however, that Felder died of specified stab wounds. Roosevelt Youngblood, an inmate in segregation where the riot broke out, was subsequently convicted of first degree murder in connection with the death of Felder. Little reliance can be placed upon the plaintiffs' witnesses concerning what occurred during the riot. Without question, the inmates in segregation, part of the class here included as part of plaintiffs' class, rebelled, initiated, and created the riot. The petitioner Lake was in the segregation unit where the riot occurred and joined actively with the rebellious group. Numerous incidents of lesser significance have been brought to the court's attention concerning which

the evidence is even more vague and unsettled. The court concludes that petitioners' evidence lacks sufficient credibility or corroboration to sustain their allegations of violence and exploitation at the hands of guards and trusties which reaches constitutional proportions.

There is insufficient creditable evidence to sustain the allegations of the remaining issues before the court, and relief other than that granted as hereinbefore set out is hereby denied.