Glenn **DIAMOND** et al., Plaintiffs,

v.

Glen **THOMPSON** et al., Defendants.

Richard E. **LAKE**, Jr., Plaintiff,

v.

L. B. **SULLIVAN** et al., Defendants.

Civ. A. Nos. 3828–N, 3900–N.

United States District Court,
M. D. Alabama, N. D.

July 30, 1973.

Wendell R. Morgan, Alton, Leavell, Morgan & Webb, Montgomery, Ala., for plaintiffs.

William J. Baxley, Atty. Gen. of Ala., and Richard F. Calhoun, Thomas W. Sorrells, Leslie Hall, and Barry E. Teague, Asst. Attys. Gen., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHNSON, Chief Judge.

This is a class action brought by inmates of the Alabama Penal System confined at Mt. Meigs Medical and Diagnostic Center, Mt. Meigs, Alabama. Plaintiffs allege numerous violations of their First, Sixth, Eighth and Fourteenth Amendment rights and seek injunctive relief and return of certain personal property. The defendants are the Commissioner of the Alabama Board of Corrections, the former and present wardens, the deputy warden and the captain of the guards at Mt. Meigs. The two cases now decided were determined by the Court to present the same basic issues and were consolidated on January 19, 1973. The cause is submitted upon the pleadings, motions, depositions, testimony taken at trial, and briefs of the parties.

The plaintiffs claim they have been denied due process of law by the actions of the defendants in reclassifying and confining them to administrative segregation and punitive isolation, higher degrees of confinement than that of general population, without first providing plaintiffs with a meaningful hearing. In addition, plaintiffs charge that while confined in administrative segregation they have been denied access to legal materials and to writing materials nec-

essary to petition the courts, and that they have been harassed and threatened for participation in legal proceedings. Plaintiffs further claim that they have been denied access to religious services and religious materials in the denominations of their choice; that they have been punished for participation in political discussions and for expression of political beliefs; and that they have been subjected to various degrees of physical brutality by the prison guards. Inhumane conditions in the segregation and isolation units, lack of sufficient heat and warm clothing, and denial of an opportunity to receive visitors or to exercise are alleged to constitute cruel and unusual punishment. Further, plaintiffs claim they have been discriminated against on the basis of race in the granting and denial of certain privileges. And, lastly, plaintiffs assert that their personal property has been confiscated without cause and without compensation. The Court has carefully scrutinized the testimony in this case, giving due weight to all the evidence, and concludes that, while plaintiffs have failed to prove all of their charges, they have shown substantial violations of rights guaranteed by the Constitution.

At the outset, the Court believes it important to place the present litigation in proper perspective. In October 1972, this Court entered its opinion in Newman v. State of Alabama, 349 F.Supp. 278, holding that prisoners within the Alabama Prison System were being deprived of proper and adequate medical treatment to which they are constitutionally entitled. Subsequently, there has been a large number of prisoner suits filed in this Court, including the present cases. The evidence presented in this case reflects a basic misunderstanding of the *Newman* order by both prison officials, including the custodial force, and inmates within the prison system. Most of the named plaintiffs in this suit are troublemakers, knowledgeable in manipulating and maneuvering others to their advantage. They are experienced in filing charges and in litigating against prison officials. They, and other inmates, have adopted the position that this Court stands ready to intervene in the administration of the prison system whenever they complain, regardless of the charge. The named plaintiffs and others continually attempt to coerce prison employees by threatening to file suit in this Court.

At the same time, the *Newman* order has engendered a high degree of resentment on the part of prison officials, especially custodial officers, who see the order as an improper interference with their duties and responsibilities in administering the prison system.

This Court wishes to disabuse all parties concerned of the notion that this Court will unduly interfere with the operation of the Alabama prison system. As the Fifth Circuit has succinctly stated, "[C]ourts simply are not equipped to police the prisons." Novak v. Beto, 453 F.2d 661 (1971). "Federal courts will not interfere in the administration of prisons absent an abuse of the wide discretion allowed prison officials in maintaining order and discipline . . . ." Royal v. Clark, 447 F.2d 501–502 (5th Cir. 1971). While federal courts do not sit to supervise prisons, they do have a duty to enforce the constitutional rights of all persons, including prisoners. Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Prison officials must realize that prisoners do not lose all their constitutional rights, and that they are entitled to petition the courts to redress their grievances. *See, e. g.,* Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). This Court will accept and discharge its responsibility of deciding the cases brought before it and will intervene in the administration of the prison system only where it is necessary to preserve constitutional rights.

The present claims had their origin in a disturbance at the Atmore Prison

Farm, Atmore, Alabama, a facility of the Alabama Prison System. On October 10 and 11, 1972, a work stoppage and sitdown demonstration were staged at Atmore, and a list of grievances was presented to prison officials there. On October 12, twenty-five prisoners believed to be the leaders of the disturbance were transferred to Mt. Meigs where they were placed in administrative segregation in Cell Block "A". Among the twenty-five prisoners were four of the named plaintiffs in Civil Action No. 3828–N. The named plaintiff in Civil Action No. 3900–N was later transferred from the Alexander City Road Camp to administrative segregation at Mt. Meigs. Although in each case these were transfers from the relative freedom of confinement in general population to the restricted confinement of administrative segregation, none of the named plaintiffs was given notice of any charges against him or provided with a hearing before the .disciplinary board. Subsequent to the filing of the complaint in No. 3828–N, and some two months after transfer, a number of the Atmore transferees were charged variously with participating in and leading the Atmore strike. They were given a hearing, and all were found guilty, for which each lost six months good time. The named plaintiff in No. 3900–N was never given a hearing in connection with his transfer to administrative segregation. At the time of trial, only a few of the Atmore transferees still remained in administrative segregation. The authorities give as a reason for this confinement, the continued refusal of the prisoners to work.

The evidence in this case reflects that at least four different degrees of confinement exist within the prison system to which different regulations apply. General population is the least restrictive of these, followed by administrative segregation and, in turn, punitive isolation. Quarantine is a temporary status given to prisoners who have just entered a prison and have not yet been classified. Inmates in administrative segregation are confined to their cells twenty-four hours a day, with the exception of two ten-minute shower periods and a one-hour exercise period each week. They are not permitted to visit the prison library or to attend religious services, since security considerations prevent them from leaving their cells and attending group meetings. According to prison regulations, however, they may receive legal and religious materials upon request and are supplied with writ paper twice each week. They are allowed visitors once every two weeks, the same as inmates in the general population, except that visits are limited to weekdays. Inmates in administrative segregation are provided with bed linen and are allowed two changes of clothing each week. They may keep in their cells a radio, watch and rings; they are allowed to receive newspapers and magazines; and they may purchase personal items from the prison store twice each day. They are provided with a spending allowance of 75¢ every three weeks. The cells in "A" block are two-man cells and each contains a wash basin and a toilet. Three meals a day are delivered to the cells. Prisoners in administrative segregation status may sometimes be confined in a different part of the prison in cells otherwise used for punitive isolation. Physical conditions there are less pleasant. There is no wash basin—only a cold water spigot. The toilet, known as a chinese toilet, consists of a hole in the floor, and can be flushed only by the guard. Lighting is poor, and there are no lockers or stands on which to place personal belongings. Although the restriction on privileges for inmates confined in these cells is presumably the same as others in administrative segregation in "A" block, the inmates refer to these cells as "a proxy doghouse", or the equivalent of punitive isolation. Inmates confined in "A" block who violate rules or disobey orders are sometimes removed to the cells in the punitive isolation unit.

Inmates may be confined to punitive isolation for as long as 21 consecutive

days. They are isolated in cells previously described where metal doors can be closed over the bars to completely shut off contact with others. They are allowed only one meal a day and are not permitted to receive visitors or religious material or, with some exceptions, legal materials. Mail to and from any court in the State of Alabama will be delivered to the inmate or mailed for him. Prisoners in punitive isolation are permitted one shower each week and one hour of exercise each eleven days. Inmates are placed in punitive isolation only pursuant to a hearing before the disciplinary board. Inmates in quarantine are allowed generally the same privileges as those in administrative segregation and, in addition, may eat in the mess hall. Visitors are restricted to an emergency basis.

### DUE PROCESS

■ ■ Procedural due process is required whenever an individual will be "condemned to suffer grievous loss." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), *quoted in* Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). It is widely recognized that, in a prison context, withdrawal of privileges or the imposition of more burdensome conditions of confinement may constitute a grievous loss calling for procedural safeguards.[1] *See, e. g.*, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (some process due in cases of "substantial discipline") (dicta); United States ex rel. Arzonica v. Scheipe, 474 F.2d 720 (3rd Cir. 1973) (due process required where "substantial punishment"); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971) (due process needed for transfer to solitary, maximum security, padlock confinement over 10 days and for loss of good time); Clutchette v. Procunier, 328 F.Supp. 767

(N.D.Cal.1971) (needed for violations punishable by indefinite confinement in the adjustment center or segregation). *Cf.* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Scarpa v. U. S. Board of Parole, 477 F. 2d 278 (5th Cir. 1973).

■ Defendants in this case admit that loss of good time is a sufficient deprivation to warrant a prior due process hearing. During the trial of this case the defendants agreed to restore the six months' good time taken from the Atmore transferees, pursuant to a hearing conducted without any procedural safeguards. In addition, it is the prison policy that inmates will be placed in punitive isolation only after a hearing by a disciplinary board. The defendants maintain, however, that transfer from general population to administrative segregation is purely an administrative measure. It is not a punitive device, but rather a security device to aid prison officials in maintaining order and discipline. It is argued that the courts should not interfere with this administrative decision-making process.

■ The distinction which prison officials attempt to make between "punishment" and "segregation" is unsound and has previously been rejected. *See* Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966). The test cannot be based upon the motives of prison officials, but must rest upon the effect of the more restrictive confinement on the inmate. If the inmate suffers a loss of "liberty", then the Fourteenth Amendment requires certain procedural safeguards.

■ ■ This Court finds that transfer from general population to administrative segregation at Mt. Meigs represents a substantial and grievous loss to prisoners. Prisoners confined in administrative segregation cannot work and earn money; their freedom to move about is severely restricted; and they are confined in close quarters almost continuously.

1. "[A]ny further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny." Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968).

Inmates in segregation cannot visit the library or attend religious services. Their visiting hours are limited to weekdays during working hours, which limits the number of visits friends and family are able to make. While these restrictions may seem minor to those in the "free world," to an individual already confined to a prison, they represent a significant loss of freedom. This Court holds, therefore, that the requirements of due process apply generally to transfers from general population to administrative segregation. Additionally, the Court finds that transfer of an inmate held in administrative segregation in "A" block cells to the cells with fewer privileges which can be used for punitive isolation does not represent a substantial loss to which due process requirements apply, provided the inmate continues in the status of administrative segregation and receives the privileges accorded that status.

The question concerning the procedural requirements of due process for prison inmates before they are subjected to a substantial or grievous loss of privileges is in a confused state. *Compare* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom.; Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), cert. denied, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972); Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Carothers v. Follette, 314 F.Supp. 1014 (S. D.N.Y.1970). As the Supreme Court has stated many times, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U. S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.

Ed.2d 484 (1972). "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L. Ed.2d 1230 (1961). See also Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

▆▆▆▆ The Court holds that, at a minimum, the prisoners transferred from Atmore to administrative segregation during the disturbance there were entitled to written notice of the charges against them, an opportunity to be heard and present witnesses and documentary evidence, if any, before an impartial board composed of persons who were not directly involved in the incident, the right to confront and cross-examine adverse witnesses, and a written statement of findings by the board.[2] As a general rule these are the minimum requirements which should apply to all transfers from general population to administrative segregation. There are, however, unusual circumstances in which a fair inquiry can be made without compliance with all these requirements. The touchstone, as in other areas, is reasonableness. For example, if an inmate has escaped from prison, there appears to be no reason to conduct a hearing prior to placing him in the security of administrative segregation. *See e. g.* Krist v. Smith, 439 F.2d 146 (5th Cir. 1971). Similarly, an admitted homosexual can be segregated for his safety or the safety of other inmates without elaborate procedural safeguards.[3] These examples, however, are in marked contrast to the transfer from Atmore. Prison officials, with justifiable cause,

2. The named plaintiff in 3900–N, Richard Lake, who was transferred from a road camp to administrative segregation supposedly because a letter he had written indicated he might escape, has since been discharged from the Alabama Prison System.

His individual claim for injunctive relief is therefore moot.

3. Such inmates should at least be notified of the reasons for transfer.

transferred inmates in an attempt to break the strike by removing the leadership. They had the right to do this summarily in such an emergency situation. It was not certain, however, whether all those who had been so hastily removed were in fact leaders of, or even strong supporters of, the strike. Under the circumstances reasonable investigation into the relevant facts could not be made without a due process hearing. This hearing should have been conducted within a reasonable time after transfer. Absent unusual circumstances, 48 hours would constitute a reasonable time.[4]

■ As a result of this class action, prison officials have recently revised the form of notice given prior to a disciplinary hearing where punitive isolation or loss of good time may be imposed. The notice is reasonable and conforms to due process requirements listed earlier with the exception of its failure to notify the inmate of the right to question his accusers. The same should be amended appropriately and its use should be expanded to transfers to administrative segregation. In view of the evidence presented at trial, however, a repeated cautionary note is in order concerning the composition of the disciplinary board. The complaining officer or the officials who make the initial decision to transfer may not sit on the board.

## FREE SPEECH

Plaintiffs complain that their right to free speech has been infringed by prison guards who have attempted to stop political discussions among the inmates in the administrative segregation unit. The evidence reflects that discussions have been held, covering a number of topics, and that correctional officers have interfered with these discussions with ridicule, threats and, in some cases, summary removal of participants to punitive isolation cells. This harassment, no doubt, is a result in part of the strong opposition of prison employees to the views expressed by the inmates. The evidence also reflects that, at times, the political discussions have become excessively noisy, with inmates several cells apart disputing with each other, and that, on occasion, discussions have continued well after the "lights out". In the close quarters of administrative segregation, this clearly has disturbed other inmates.

■ Like the right to practice religion freely, the right to exercise free speech has received special protection by the courts, even within prison walls. The Fifth Circuit has pointed out that stringent standards are to be applied to restrictions by prison officials in the area of First Amendment freedoms. "The State must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement . . . ." *Jackson v. Godwin*, 400 F.2d 529, 541 (1968). The Court holds, therefore, that, subject to reasonable restrictions as to time and place, prisoners must be allowed to discuss their views among themselves without interference. This does not mean, of course, that prison officials cannot take reasonable measures to preserve discipline and order should the discussions continue late at night or otherwise cause a disturbance.[5]

## SUMMARY CORPORAL PUNISHMENT

■ Some evidence was presented in this case to the effect that inmate Gustt Bibb, after exchanging words

---

4. This time limit is also applicable to transfers to punitive isolation.

5. There is no evidence in this case that the *content* of the discussions was such that it incited or threatened to incite a disturbance within the prison. As in other forums, speech which endangers the safety of the institution may not be protected. At least one circuit has applied the familiar "clear and present danger test" in the prison context. *Long v. Parker*, 390 F.2d 816, 822 (3rd Cir. 1968).

with the guards during an exercise period, was taken into a shower and beaten by a guard while others looked on. The testimony of Bibb and the others that attempted to corroborate his testimony impressed this Court that if the incident did occur, it was an isolated instance unlikely to recur. It is elementary that the infliction of summary punishment without any semblance of due process is impermissible. *See* Anderson v. Nosser, 456 F.2d 835 (5th Cir. 1972) (en banc) *citing* Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Where such abuses are likely to recur, it is appropriate to enjoin correctional personnel from summarily beating or otherwise physically mistreating inmates. See Belknap v. Leary, 427 F.2d 496 (2d Cir. 1970). This does not mean that prison officials may not use reasonable force to move inmates, maintain order, or ensure compliance with regulations. *See, e. g.,* Konigsberg v. Ciccone, 285 F. Supp. 585 (W.D.Mo.1968), aff'd, 417 F. 2d 161 (8th Cir. 1969).

However, evaluating the testimony regarding this incident, this Court is impressed that the incident possibly never occurred at all and if it did, there is no likelihood of recurrence and no injunction under these circumstances is appropriate.

## GENERAL CONDITIONS OF CONFINEMENT

■ Plaintiffs have failed to prove that the alleged inhumane conditions within the cells, the lack of heat and proper clothing, and the denial of the opportunity to receive visitors and exercise rise to a level which would constitute cruel and unusual punishment. While it is clear to this Court that such conditions can detract significantly from the process of rehabilitation—the principal goal of an enlightened prison system —they do not exceed the Eighth Amendment limits as outlined by the Fifth Circuit. *See, e. g.,* Novak v. Beto, 453 F.2d 661 (5th Cir. 1971).

■ In addition, plaintiffs have failed to prove their claim of discrimination on the basis of race. The Court notes in this regard that officials of the Alabama Prison System have evidenced a good faith determination to end segregation within the prisons pursuant to this Court's order in Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1966). The evidence in this case reflects that unacceptable practices, such as the use of the term "boy" by correctional officers, still occur within the system. They occur, however, with decreasing frequency, and the efforts of prison officials in working with low-paid and usually poorly educated correctional officers are generally satisfactory.[6]

■ The rules and regulations applicable to administrative segregation, punitive isolation and quarantine, governing visitation, access to legal and religious materials and exercise cannot be found an abuse of the broad discretion prison authorities have in these areas.[7]

---

6. An increase in the number of black correctional officers from the present 2 out of 63 employed at Mt. Meigs would go a long way toward eliminating such problems.

7. A further statement is in order concerning the complaint by the plaintiffs in segregation and isolation that they are not permitted to attend religious services. The defendants argue that security considerations preclude inmates in restricted status from attending group meetings. As previously noted, the rules allow inmates to receive religious materials and visits by the Chaplain or other minister of their choosing. The issue presented has been phrased by the Fifth Circuit as follows: "[Whether] the rules and regulations imposed on these prisoners are reasonable and justifiable in the administration of a large prison population, maintenance of discipline, and control of any dangers and hazards presented." Walker v. Blackwell, 360 F.2d 66, 69 (1966). The Court finds that the restriction on attending religious services applied to inmates in segregation and isolation is reasonable in light of the need for security and of the alternative provisions made to ensure the religious well-being of the inmates.

Plaintiffs have proved, however, by credible evidence, that the regulations are not uniformly enforced but rather are applied in an arbitrary and discriminatory fashion. Prior to the filing and prosecution of this suit, some of the plaintiffs could not obtain legal materials and writ paper, although repeated requests were made, sometimes in writing. Some inmates also were told by the guards they could not have visitors, and in other cases requests to place certain names on the visitor list were never acted upon. Several inmates, including a Muslim minister who asked for a copy of the Muslim Bible, have requested religious materials. At least one inmate, a Catholic, has made requests for a visit by the Chaplain or priest. None of these requests have been acknowledged or acted upon. In addition, the guards discriminate against those inmates they dislike by offering to take them to exercise only when the weather is bad. And finally, some of the Atmore transferees have never received their personal property, such as books, papers, clothing and toiletries, which they were not allowed to bring with them at the time of transfer, but which they are under the prison rules permitted to have in administrative segregation.

As the Fifth Circuit has pointed out, it would be naive to believe that every prison employee obeys prison regulations to the letter. Novak v. Beto, 453 F.2d 661 (1971). The above examples, however, do not represent an occasional deviation from prison policy, as could be expected. Violations of regulations by prison employees are pervasive. They result from an almost complete break-down in communications between the prison officials and the guards concerning prisoner requests for allowed privileges. The requests, handed or made to the guards, apparently never reach their destination along the chain of command within the prison. Prison administrators have not made sufficient effort to correct these deficiencies so as to enforce the policies they have adopted. *See* Novak v. Beto, 453 F.2d 661 (5th Cir. 1971). It is necessary, therefore, for this Court to act to ensure an even-handed application of rules, guaranteed by the Fourteenth Amendment, and a reasonable access to legal and religious materials guaranteed by the Sixth and First Amendments, respectively. *See, e. g.*, Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 42 (1971); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968). *See also* Culp v. Martin, 471 F.2d 814 (5th Cir. 1973) (recognizing right to sue for recovery of personal property confiscated by jail officials). The prison administrators must establish tighter control over the activities of the guards. As a first step, it will be ordered that all custodial employees who have contact with prisoners wear name plates.

When plaintiffs filed this class action pursuant to Rule 23, Federal Rules of Civil Procedure, it was determined that plaintiffs were entitled to be represented by competent legal counsel in this proceeding. Accordingly, the Honorable Wendell R. Morgan, Attorney at Law, Montgomery, Alabama, was appointed to represent the plaintiffs. Mr. Morgan has represented the plaintiffs well, and the decision in this case has inured to the benefit of members of the class. He, therefore, is entitled to a reasonable attorney's fee. *See, e. g.*, Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Callahan v. Wallace, 466 F.2d 59 (5th Cir. 1972). It appears from the affidavits submitted to the Court that the sum of $3,800 is a reasonable fee to be awarded Mr. Morgan for services rendered plaintiffs and the members of their class.

An appropriate order will be entered accordingly.