Brian Mark BURKE et al.

v.

Edward H. LEVI et al.

Civ. A. No. 629–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

March 14, 1975.

Brian Mark Burke and others, pro se.

Raymond A. Carpenter, Asst. U. S. Atty., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, appearing pro se, are federal prisoners incarcerated at the Petersburg Federal Reformatory, Petersburg, Virginia. They bring this class action against the Attorney General of the United States and the Director of the Bureau of Prisons, challenging certain Bureau regulations and regulations of the Petersburg Reformatory which allegedly violate their rights under the First, Fifth and Ninth Amendments to the Constitution of the United States. Plaintiffs seek declaratory and injunctive relief as well as relief in the nature of a writ of mandamus. Jurisdiction of the Court is attained pursuant to 28 U.S.C. §§ 1361, 2201 and 2202.

The matter is presently before the Court on defendants' motion to dismiss and motion for summary judgment. Plaintiffs, given an opportunity to respond, have failed to do so. The Court, therefore, deems this matter ready for disposition upon the pleadings before it.

The gravamen of plaintiffs' complaint is that the defendants, their officers, agents and employees, arbitrarily and capriciously regulate inmate correspondence, incoming publications, inmate visits and the inmate newspaper and that such regulation denies plaintiffs of their liberty without due process of law and is part of a consistent pattern and practice to do so on the part of the defendants. Plaintiffs further ask the Court to promulgate fair rules and policies which

will be consistent with the constitutional guarantees to which they are entitled.

Plaintiffs' allegations are, for the most part, an attack on the prison regulations as written rather than as applied. With respect to the regulation of inmate correspondence,[1] plaintiffs contend that the inspection, review and censorship of outgoing and incoming mail has a "chilling effect" on the exercise of their First Amendment rights. Moreover, they question the stated underlying purpose of this regulation to the extent it is designed to maintain prison security and to learn about problems confronting the inmates in order to alert the staff to any manner in which they may help in evaluating the inmate's progress.

As to the control of incoming publications,[2] plaintiffs complain that the existing policy is not coherent and that, by allegedly limiting access to certain educational materials, it frustrates the inmates' efforts to attend school upon release. They suggest that such a policy violates the spirit, if not the letter, of the First Amendment and contravenes their rights to due process of law.

In terms of visitation privileges,[3] plaintiffs allege that they are subject to

---

1. Plaintiffs specifically point to portions of Institution Policy Statement No. LEE–7300.14B, dated September 20, 1972, which read as follows:

 5. PROCEDURE.

 a. The inmate, upon admission, will be asked to sign Record Form 61. This is an authorization for staff to open, read, and inspect all regular mail. Failure to sign this form will result in withholding of correspondence privileges.

 * * * * *

 d. *Outgoing Mail.*

 * * * * *

 (3) All outgoing regular mail will be examined for enclosures and spot-checked for verbal content by designated officers . . . . It should be done frequently enough to maintain security, learn about a particular problem confronting the inmate or alert the staff to any matter that may help in evaluating the inmate's progress.

2. Plaintiffs cite to the Court Institution Policy Statement No. LEE–7300.39B, dated March 3, 1971, which reads in pertinent part:

 1. POLICY.

 * * * * *

 b. An approved list of publications will not be maintained at the institution.

 * * * * *

 3. PROCEDURE.

 a. Publications shall come directly from the publisher and not by way of friends or families.

 * * * * *

 d. All publications, with the exception of religious and legal publications shall be referred to the Education Department for receiving and delivery to the inmates.

 * * * * *

 k. The methods of purchase and subscribing shall be as follows:

 * * * * *

 (3) . . . (P)rior approval shall be obtained from the Education Department who will fill out the necessary forms. . . . (C)opies of the approval for materials will be sent to the Mail Room, which will be authorization for an inmate to receive materials.

 (4) Materials coming to the inmate without prior approval or from any source other than the publisher will be returned to the place of origin by the Mail Room.

 * * * * *

3. Plaintiffs challenge those portions of Institution Policy Statement No. LEE–7300.24C, dated September 21, 1972, which read:

 * * * * *

 5. PROCEDURE.

 a. Upon admission to the institution, a visiting list will be prepared for all inmates desiring visits. Each person on this list must be approved by the inmate's Caseworker. Any additions to or deletions from this list must also be approved by the Caseworker.

 b. Any "Special Visits" from persons not already on the approved visiting list must be approved in advance by the inmate's Caseworker . . . . In the absence of the Caseworker, the Watch Supervisor has the prerogative of approving or disapproving any visit which is not authorized in advance.

 * * * * *

 d. Visiting Room Operation.

 * * * * *

 (2) The amount of visiting time permitted each inmate is limited to five (5) visits per month. On Saturdays, Sundays and Holidays

the whim or caprice of the caseworkers and that the current procedure of close surveillance of inmates and visitors in a closed environment and subsequent strip searches of inmates after visits are sufficient to satisfy the need to maintain order and security within the institution. The only factual allegations presented in this regard are contained in a motion to intervene as party plaintiffs filed by Robert Schoonover and Thomas Clay. Schoonover contends that, after being placed in isolation on January 5, 1973, his visits with his fiancée and another friend were restricted in duration to one hour on January 6, 1973, and to forty minutes on January 7, 1973, whereas, ordinarily, inmates in isolation are permitted full visiting privileges. Clay, on the other hand, bases his complaint on the fact that his request that a "young lady friend" be placed on his list of approved visitors was denied without his being given a reason for the denial by his Caseworker. Plaintiffs allege that the regulations and their administration unduly interfere with their First Amendment rights to freedom of association.

Finally, plaintiffs question the procedures pursuant to which the inmate newspaper is subject to review by a prison official prior to publication.[4] They suggest that the screening of material by the newspaper staff itself is sufficient to satisfy the need to maintain security and that the policy complained of chills the inmates' exercise of their rights to "free speech."

Defendants, in support of their motion for summary judgment, contend that the procedures and regulations to which the plaintiffs object are reasonable and necessary to control and maintain discipline and authority at the Petersburg Federal Reformatory. Defendants have also submitted the affidavit of Mr. Bruce Grant, Acting Warden of the Petersburg Reformatory, to which are attached copies of the Bureau of Prisons and Petersburg Reformatory policy statements about which plaintiffs complain.

As this Court has previously recognized, the right of federal prison authorities to promulgate regulations necessary and proper to foster orderly prison administration is broad. Howard v. Warden, Petersburg Reformatory, 348 F.Supp. 1204 (E.D.Va.1972). Though federal courts clearly may inquire into a prison administrator's restriction of constitutional rights other than that of liberty itself, see e. g. Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), the judgments of prison officials, while not binding on the Court, are entitled to considerable weight. Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971). Moreover, under the guise of protecting constitutional rights, federal courts do not have the power to, and must be careful not to, usurp the responsibility that rests with the executive branch for the management of prisons. It is only when the deprivations of prison confinement impose conditions of such onerous burdens as to be of constitutional dimensions that courts may intervene in prison management. Breeden v. Jackson, 457 F.2d 578, 580 (4th Cir. 1972).

visits will be limited to three (3) hours each. These limitations are necessary to avoid overcrowding of the visiting area and excessive loss of time from the inmate's treatment program. Requests for additional visiting time beyond these limits must be approved in advance by the inmate's Caseworker.

\* \* \* \* \*

4. The parties agree that there are no written regulations concerning the review of the in-

mate newspaper prior to publication. Defendants allege, in the form of a sworn affidavit by the Acting Warden of the Petersburg Reformatory, that all publications are reviewed by the Associate Warden prior to printing and that inflammatory material which might lead to violence between racial or other groups is not allowed. They further contend that criticism of the Bureau of Prisons or institutional policy is not restricted.

Recent Supreme Court opinions have gone far in clarifying the extent to which the First Amendment rights of inmates in penal institutions may be limited. In terms of censorship of prisoner mail, the Court has recognized that the proper standard of review for any prison regulations restricting freedom of speech rests not upon certain assumptions about the legal status of prisoners but rather concerns but one aspect of the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities. Procunier v. Martinez, 416 U.S. 396, 409, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Applying the teachings of its prior decisions, such as Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), to the context of prisons, the Court held in *Procunier* that the censorship of prisoner mail is justified if the following criteria are met:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitations of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its

sweep is unnecessarily broad. . . . 416 U.S. at 413–414, 94 S.Ct. at 1811.

■■ With regard to the reformatory regulation on inmate correspondence under attack in the instant matter—Institution Policy Statement No. LEE–7300.14B—the Court finds that the criteria enumerated in Procunier v. Martinez, *supra*, 416 U.S. 396, 94 S.Ct. 1800 (1974), are met with the exception of that part of paragraph 5(e) of the Statement which permits the screening of incoming and outgoing mail for "(c)ontents which suggest . . . false, malicious, libelous or confidential information about individual inmates, government officials, and others." To the extent that this portion of the reformatory regulation exceeds the guidelines set down in paragraph 6(c)(1)–(5) of Policy Statement No. 7300.1A of the Federal Bureau of Prisons,[5] it, in the words of Mr. Justice Powell, "fairly invite(s) prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship." Procunier v. Martinez, *supra*, 416 U.S. at 415, 94 S.Ct. at 1812. Moreover, defendants have failed to allege or prove that these broad restrictions on prisoner correspondence are necessary to further any governmental interest unrelated to the suppression of expression. Accordingly, as to plaintiffs' initial claim, the Court will grant defendants' motion for summary judgment in part. At the same time, the Court, finding no genuine issue of material fact, will, on its own motion, grant summary judgment for plaintiffs to the extent heretofore noted.

■■ Turning to plaintiffs' second claim concerning the regulation of incoming publications, the Court finds the law is clear that "(t)he Constitution protects the right to receive infor-

5. This section of the Bureau Policy Statement was cited by the Court in *Martinez* as an example of a policy followed at well-run institutions which would be relevant to a de-

termination of the need for a particular type of restriction. 416 U.S. at 414 n. 14, 94 S. Ct. 1800.

mation and ideas" and that "(t)his right to receive information and ideas, regardless of their social worth, . . . is fundamental to our free society." Stanley v. Georgia, 394 U.S. 557, 564, 89 S. Ct. 1243, 1247, 22 L.Ed.2d 542 (1969). Moreover, in recent years numerous courts have recognized that an inmate of a penal institution retains the right to read what he pleases and that "(o)nly a compelling state interest centering around prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment" of this right. Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y.1970). See also Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971); Rhem v. Malcolm, 371 F.Supp. 594, 634 (S.D.N.Y.1974); Collins v. Schoonfield, 344 F.Supp. 257, 281 (D.Md.1972); Seale v. Manson, 326 F.Supp. 1375, 1381 (D.Conn.1971).

 With regard to Petersburg Reformatory Policy Statement No. LEE–7300.39B, the Court finds unacceptable those portions of the Statement which require that "(p)ublications shall come directly from the publisher and not by way of friends or families" and that "(m)aterials coming to the inmate . . from any source other than the publisher will be returned to the place of origin by the Mail Room." Since the defendants apparently rely upon their general allegation that this procedure is necessary to maintain prison security, the Court finds this particular procedure to be constitutionally invalid. For, as Judge Lasker recently noted in striking down a similar policy maintained by the Manhattan, New York, House of Detention for Men:

> Although it is true that contraband may be smuggled within the pages of a magazine, or in hollowed books, the risk is absolutely controllable by inspection of incoming mail. Thus the true reason for the rule is to promote economy and administrative convenience. Aside from the fact that the policy imposes a significant hardship on inmates, most of whom are poor, by requiring them to buy books and magazines which they could otherwise receive without cost from friends or relatives, the rationale of economy and administrative convenience is unsupportable, particularly where the "preferred" rights secured by the First Amendment are at stake. Rhem v. Malcolm, 371 F.Supp. at 634

As to plaintiffs' broadly framed contention that educational materials, college catalogues, bulletins and applications for admission are not deliverable to them, the Court finds nothing in the challenged regulation to support this allegation. Therefore, on the basis of the pleadings before it, the Court will grant defendants' motion for summary judgment as to plaintiffs' second claim with the exception of that portion of Policy Statement No. LEE–7300.39B previously held to be unconstitutional.

Plaintiffs' third claim concerns Petersburg Reformatory Policy Statement No. LEE–7300.24C, which establishes regulations and procedures for the operation of the inmate visiting program. The Court notes that the Supreme Court has recently spoken to this issue as well. Although in Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the issue before the Court was the constitutionality of a California Department of Corrections regulation prohibiting press and other media interviews with specific individual inmates, the Court's opinion dealt extensively with prisoners' rights of visitation as one manner of communication between prison inmates and members of the general public.

In *Pell*, Mr Justice Stewart noted first that challenges to prison regulations based on asserted constitutional rights of prisoners must be assessed in light of the legitimate penal objectives of the deterrence of crime, the protection of the general public, the rehabilitation of those committed to custody and the institutional consideration of internal se-

curity within the corrections facility itself. He then went on to state that the regulation in question could not be considered in isolation but must be viewed in the light of the alternative means of communication permitted with persons outside the prison, such as the open and substantially unimpeded medium of written communication previously recognized by the Court in Procunier v. Martinez, *supra,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

Mr. Justice Stewart went on to further recognize that institutional considerations, such as security and related administrative problems, require that some limitations be placed on face-to-face communication with inmates and that, so long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, prison officials must be accorded latitude in drawing such lines. Finding that the Court had previously upheld reasonable time, place and manner regulations of communicative activity where necessary to further significant governmental interests, Mr. Justice Stewart stated:

> The "normal activity" to which a prison is committed—the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence—necessarily requires that considerable attention be devoted to the maintenance of security. Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates. 417 U.S. at 826–827, 94 S.Ct. at 2806.

Evaluating plaintiffs' third claim in light of the Supreme Court's remarks in *Pell,* the Court finds nothing within Petersburg Reformatory Policy Statement No. LEE–7300.24C to suggest that the defendants have "exaggerated their response to the institutional considerations heretofore noted. Accordingly, the Court will grant defendants' motion for summary judgment in this regard.

Finally, plaintiffs contend that defendants' policy of reviewing the inmate newspaper prior to printing has a "chilling effect" on the exercise of their First Amendment rights. In light of the sworn statement of the Acting Warden of the Petersburg Reformatory, which plaintiffs neither dispute nor rebut, that the only material censored is that "which might lead to violence between racial or other groups," it appears to the Court that this claim is without merit. Even were the Court to assume that plaintiffs should be permitted to publish their own newspaper within the institution for the rehabilitative value such an activity would provide, see Sostre v. McGinnis, 442 F.2d 178, 190–191 (2d Cir. 1971), it is the Court's view that prison officials may limit this program to the extent it would conflict with the institutional need to maintain security and order. Moreover, after reviewing various issues of the inmate newspaper tendered by the defendants, the Court is constrained to note that plaintiffs are apparently and properly permitted to comment on nearly every facet of institutional life as well as all members of the prison administration. Accordingly, on the basis of the pleadings and evidence before it, the Court will grant the defendants' motion for summary judgment as to plaintiffs' fourth claim.

An appropriate order will issue.