**Vernon E. GOODSON, Plaintiff,**

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 9–70898.

United States District Court,
E. D. Michigan, S. D.

July 16, 1979.

Vernon E. Goodson, pro se.

Thomas M. Woods, Asst. U. S. Atty., Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

Plaintiff is a prisoner at the Federal Correctional Institution at Milan, Michigan. He brought this action in an attempt to force the authorities at the prison to permit him to receive and to keep several issues of the *National Socialist Bulletin.*

Pursuant to Bureau of Prisons Policy Statement 7300.42D (10/18/77), Institutional Policy Statement NM 7300.42A (12/28/77), and the Supervisor of Education's Memorandum to the Mail Room (1/20/78), the Assistant Supervisor of Education for the prison determined that the publication in question was unacceptable for forwarding to the inmate. Plaintiff argues, and the magistrate agrees, that the standards used in making this decision are overly broad in light of the inmate's First Amendment rights, and he asserts that unless and until narrower standards are drawn to more fully take into account these important rights and this publication is judged under such standards to be unacceptable, the publication must be forwarded to him.

Plaintiff cites the United States Supreme Court opinions of *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1971), and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1973), in support of his argument. In *Martinez,* the Court set the standards by which prison regulations which restrict the flow of mail to and from inmates must be judged:

> Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the pro-

tection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. 416 U.S. at 413–14, 94 S.Ct. at 1811.

While the *Martinez* case dealt only with personal mail (and specifically reserved the question of whether and to what extent the announced principles would be relevant in the case of mass mailings), this court believes that the same principles must apply in this and other similar cases. *See Aikens v. Jenkins*, 534 F.2d 751 (7th Cir. 1976); *Morgan v. LaVallee*, 526 F.2d 221 (2d Cir. 1975); *Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1976).

■ We must closely examine the applicable rules that govern the censorship that is complained of here. The applicable portions of the Bureau of Prisons Policy Statement are:

4. GUIDELINES.

\* \* \* \* \* \*

b. A publication is not acceptable if it is determined to be detrimental to the security, good order or discipline of the institution.

c. The Chief Executive Officer at each institution will designate the staff members responsible for reviewing and approving incoming publications

. . . . .

d. A publication may be excluded from the institution on the basis of the standard of paragraph 4(b) above. A book or issue which demonstrates unacceptability on that standard may be placed on an excluded list. A subscription publication which is questionable may require the review of several issues before a decision is made as to permitting or excluding the publication. Occasionally, individual issues of otherwise permitted publications may be found to be unacceptable and may be individually excluded. It is suggested that this policy can best be implemented by hav-ing posted in the mail room a list of permitted publications and another list of excluded publications. When a publication is received, the mail room officer can refer to this list, to see whether it can be delivered or not. A publication which is not listed would be referred to the designated staff for review and decision.

e. As indicated in 4(b) above, the decision not to forward a publication to an inmate under this Policy Statement must be based on a showing that doing so will be detrimental to the security, discipline or good order of the institution. It should not be based solely on its religious, philosophical, political, social or sexual views.

f. Where a publication is found to be unacceptable under this Policy Statement, the inmate will be advised in writing of the decision and the reasons. The Administrative Remedy procedure (P.S. 2001.6) may be used to complain of the decision . . . The publisher will be advised as well that he may obtain an independent review of the rejection by writing to the Regional Director within 15 days of the rejection letter. An inmate may request a further review, after a lapse of at least 6 months, of a subscription publication.

\* \* \* \* \* \*

5. ACTION. The head of each institution will develop local policy statements and/or working guidelines to implement this policy. These will be submitted to the Assistant Director, Correctional Programs for review.

\* \* \* \* \* \*

The Institutional Policy Statement includes the following provisions:

4. (b) The Assistant Supervisor of Education is charged with the responsibility of approving the content of publications and will determine that the requested publication is acceptable.

\* \* \* \* \* \*

(d) Caution will be exercised before declaring a publication unacceptable because of its religious, philosophical, or social views. A decision to exclude under this section will be based on a clear showing that admission of the publication will jeopardize the security, discipline and good order of the institution.

(e) A decision not to forward a subscription type publication or book to an inmate will be based on a showing of detriment to the institution's security, discipline or good order. The inmate will be advised of the rejection and the reasons for the rejection in writing.

5. SUBSCRIPTIONS:

(a) All subscription magazines and newspapers may be placed on an excluded list by the Assistant Supervisor of Education. However, several issues should be reviewed before such a decision is made.

(b) Rejected issues will ordinarily be returned to the publisher. A copy of the rejection letter will be sent to the publisher, with a request to discontinue the mailing of the subscription, rather than an issue, [if] found unacceptable. The publisher will be advised that an independent review of the rejection may be obtained by writing to the Regional Director within fifteen (15) days of the rejection letter. An inmate may request a further review, after a lapse of six (6) months, of a rejected subscription publication.

(c) A list of magazines and newspapers not approved will be kept in the mail room. Publications on this list will be returned to sender.

The Supervisor of Education's Memorandum to the Mail Room includes the following as types of publications which are "questionable" and therefore should be directed to the Assistant Supervisor of Education for a determination of acceptability:

2. Racist publications advocating confrontations between races.

3. Political publications encouraging civil disobidience [sic] or disruption of governmental institutions or functions.

After listing the types of publications that are "questionable," the memorandum goes on to say:

Care must be exercised to assure that any disapproval is not based on moral judgements [sic] but on specific articles or pictures which violate the above guidelines. Great latitude should be exercised in the screening of heterosexual materials. Politically oriented materials should be approved unless they specifically suggest violence, confrontation or disruptive practices.

■ With these guidelines in mind, the Assistant Supervisor of Education was called upon to determine whether the National Socialist Bulletin was an acceptable publication for delivery to an inmate.

After reviewing six issues of the publication and finding that the majority included "editorial comments which are not only racist in nature but which appear to embrace [sic] violent methods of dealing with racial issues," the Assistant Supervisor of Education determined that the National Socialist Bulletin was an unacceptable publication and he so informed both the plaintiff and the publisher.

The magistrate before whom plaintiff's motion for a preliminary injunction and defendants' motion for summary judgment were heard focused on the broad wording of the Bureau of Prisons Policy Statement and the Institutional Policy Statement without considering the substantial narrowing effect of the Supervisor of Education's Memorandum to the Mail Room and the Notice of Unacceptability from the Assistant Supervisor of Education.

Noting that the Supreme Court had said that:

[a ban on "inflammatory political, racial, religious or other views] is not narrowly drawn to reach only material that might be thought to encourage violence nor is its application limited to incoming letters,

the magistrate recommended a finding that the censorship system was constitutionally infirm. This court cannot agree.

In *Martinez,* the Supreme Court found that:

> The regulations invalidated by that court authorized, *inter alia,* censorship of statements that "unduly complain" or "magnify grievances," expression of "inflammatory political, racial, religious or other views," and matter deemed "defamatory" or "otherwise inappropriate." These regulations fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prison mail censorship. Not surprisingly, some prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress unwelcome criticism.

416 U.S. at 415, 94 S.Ct. at 1812. The magistrate based his recommendation on his belief that the rule permitting withholding of publications which are "detrimental to the security, good order or discipline of the institution" is too broad under the holding in *Martinez.* The court believes that this is not the question that is before it, and therefore, it expresses no opinion on the issue.

What is before the court is the entire censorship system which does include the Policy Statements that the magistrate referred to, but which also includes the Memorandum to the Mail Room and the Notice of Unacceptability. While the system set up in *Martinez* gave broad discretion to individual prison officials to impose their own brand of censorship on the inmates, such is not the case here. This is not to say that every system which is set up under the Bureau of Prisons Policy Statement that has been referred to here is sufficiently narrow; only the system at this prison as it was applied to this plaintiff and these publications is at issue.

Not only does it appear from a study of all of the evidence produced by the instant motions that the system is narrow enough to withstand constitutional attack, but it appears that the officials at this prison should be applauded for their careful efforts in this area. The system is one in which the interests of all of the prisoners and prison officials are properly taken into account. This is the type of system that the Supreme Court must have had in mind in *Martinez.*

In making the final decision regarding the acceptability of these publications, the Assistant Supervisor of Education was not hasty; he reviewed six issues before deciding. Once he took the time to carefully examine the six issues, he determined that the likelihood that subsequent issues of the National Socialist Bulletin would contain similarly unacceptable material was such that the prison should not have to invest any more time scrutinizing each additional issue as it arrived. *See McCleary v. Kelly,* 376 F.Supp. 1186 (M.D.Pa.1974).

Whether the court would have come to the same decision regarding future publications is irrelevant to the issue; that decision is one which has been properly delegated by the executive branch of government, through the Justice Department, to the Bureau of Prisons, and it is not for the court to substitute its solutions for those of the Bureau. As the Supreme Court recently said,

> [U]nder the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Bell v. Wolfish,* —— U.S. —— at ————, 99 S.Ct. 1861 at 1886, 60 L.Ed.2d 447. *See also Burke v. Levi,* 391 F.Supp. 186 (E.D.Va.1975).

For all of the above reasons, the court chooses not to adopt the recommendation of the magistrate, and plaintiff's motion for preliminary injunction is denied while defendants' motion for summary judgment is granted.

So ordered.