Richard F. ALLGOOD, Appellant,

v.

Edward C. MORRIS, Warden of M.C.C.;
S.V. Pruitt, Assistant Warden of
M.C.C., Appellees.

No. 82–6809.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1983.

Decided Jan. 12, 1984.

Steven D. Rosenfield, Charlottesville, Va. (Wyatt, Rosenfield & Green, Charlottesville, Va., on brief), for appellant.

Peter H. Rudy, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees.

Before HALL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

Richard F. Allgood appeals from the district court's order granting summary judgment for defendants and dismissing his action brought pursuant to 42 U.S.C. § 1983. Finding no error, we affirm.

## I.

In June, 1981, Allgood was incarcerated at Mecklenburg Correctional Center (MCC), a maximum security prison, in Virginia. After his assignment to a cellblock, Allgood claimed that other prisoners made racial comments and threatened him with physical harm. He complains he was the only white prisoner housed among eleven black prisoners in his cellblock.[1]

On June 26, 1981, Allgood was injured when an inmate struck him in the face. At approximately 9:30 that morning, Allgood had gone onto the basketball court after the conclusion of a game among other inmates. Without provocation, a black prisoner struck Allgood in the face with his fist. An emergency situation was called from the tower. Two correctional officers responded and separated Allgood and his assailant. Both were handcuffed and escorted back to their cells. After being returned to his cell and within five minutes of the attack, Allgood was examined by MCC medical personnel. X-rays revealed that he had sustained a fracture, and he was transported to the Medical College of Virginia that same day and remained there until July 7, 1981.

Upon his return to MCC, Allgood was assigned to a different building. Again, he complained that he was the only white prisoner among eleven black prisoners and that these prisoners threatened to harm him. On July 21, 1981, the Institutional Classification Committee convened to determine Allgood's promotion in the institutional phase program. Allgood stated that he could "make it" in the building where he was then assigned but that he would like to be assigned to Building No. 5. On July 27, 1981, Allgood was transferred to Building No. 5 as he requested.

Two days later, on July 29, 1981, Allgood wrote a "last will and testament" letter to his mother and implied that some harm would come to him. This prompted his mother to call the warden of MCC and inquire about her son's welfare. Immediately after this conversation, correctional officers spoke with Allgood to see if he wished to move. Allgood alleges that he was offered protective segregation but that he refused it because this segregation would result in a loss of recreation and canteen privileges.

In September, 1981, the Regional Administrator of the Department of Corrections inquired about Allgood's safety. Allgood was again advised that different housing arrangements could be explored. Allgood did not request to be transferred nor did he request to be placed in protective segregation.

On the morning of October 1, 1981, all inmates underwent a "shakedown" for possible weapons. At approximately 10:40 a.m. that morning Allgood was playing basketball when a black prisoner approached him and without any warning appeared to hit him with his fist. Correctional officers responded to separate the two men. It was later learned that Allgood had been

---

1. Allgood makes no representation as to the racial mix of the entire prison population at MCC, and we do not consider whether racial discrimination exists in the composition of the cellblocks.

stabbed. Allgood was treated by the MCC medical department and was transported to South Hill Hospital. Upon his return to MCC, Allgood was housed in protective segregation while preparations were made for his transfer to another institution.

Allgood then instituted this action pursuant to 42 U.S.C. § 1983 alleging (1) that prior to his attacks, prison officials failed to protect him adequately from other inmates, (2) that during his attacks the prison guards made no effort to rescue him, and (3) that after the attacks he received inadequate medical treatment. The district court granted summary judgment for the prison officials and held that under *Breeden v. Jackson,* 457 F.2d 578 (4th Cir.1972), the prison officials had fulfilled any duty to protect Allgood because protective segregation was available to him at all times. The district court further held that affidavits and other supporting documents submitted by prison officials showed that the guards promptly rescued Allgood and that prison officials did not demonstrate a deliberate indifference to Allgood's medical needs. Allgood appeals.

## II.

On appeal, Allgood's primary contention is that his confinement in protective segregation violated his Fourteenth and Eighth Amendment rights. He argues that because a prisoner in protective segregation loses privileges afforded those in the general population, placing an inmate who has not violated prison rules in protective segregation contravenes the equal protection clause of the Fourteenth Amendment. Allgood further contends that the Eighth Amendment requires an alternative to protective segregation for a prisoner seeking protection from physical harm. We do not agree with these contentions.

In *Breeden v. Jackson,* 457 F.2d 578 (4th Cir.1972), this Court addressed the differences in privileges between inmates in the general population and those in protective custody. In *Breeden,* a Virginia prisoner was transferred at his own request from the general prison population to maximum security. He complained that the deprivations imposed upon him in maximum security represented cruel and unusual punishment prohibited by the Eighth Amendment. His complaints related to limited recreational or exercise opportunities, the prison menu, and restricted shaving and bathing privileges. Addressing the issue of limited privileges, this Court stated that:

> So long as the rules of prison management ... "are necessary or reasonable concomitants of imprisonment," ... so long as the rules are not exercised "in such a manner to constitute clear arbitrariness or caprice," no constitutional rights are infringed.
>
> The deprivations of which the petitioner complains here do not assume constitutional dimensions; they are neither arbitrary nor capricious. Under petitioner's own claim, they are the usual and accepted regulations imposed in maximum security. They "[do not] amount to ... denials of equal protection of the laws." They are manifestly within the discretionary authority of the prison administration.

*Id.* at 580–81. The complaints of Allgood are almost identical to those of the prisoner in *Breeden,* and we conclude that the prison restrictions, then and now, "are neither arbitrary nor capricious" and are not "denials of equal protection of the laws." *Id.* at 581.

The test applicable to determine whether there is a violation of equal protection between inmates in the general prison population and those in protective segregation is to "inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose." *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). The restriction on privileges granted to Allgood in protective segregation is a function of security and order. The rationality of a distinction between privileges for prisoners in the general population and those in protective segregation goes to the fundamental purpose of such segregation. Protective segregation is offered to inmates for their safety, the safety of others in confinement,

and to insure institutional security and order. To allow prisoners in protective segregation to enjoy all of the same privileges to the same degree as those in the general population would eviscerate the value of protective segregation. Because the differences in treatment among prisoners in protective segregation and in the general population has a substantial, rational basis in the legitimate state interest of prison security, we hold that Allgood's rights to equal protection have not been abridged.

### III.

Allgood further contends that placement in protective segregation for someone who has not violated prison rules is a violation of the Eighth Amendment prohibition against cruel and unusual punishment. This Court has repeatedly refused to adopt such a theory.

As previously discussed, this Court was confronted with the same issue on almost identical facts in *Breeden*. We held that the deprivations associated with maximum security confinement did not amount to cruel and unusual punishment. 457 F.2d at 581.

In 1975, this Court sitting *en banc* reiterated that segregated confinement is not per se unconstitutional. *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 860–62 (4th Cir.1975). In *Sweet,* the plaintiff, who had requested that he be placed in segregated confinement, brought a civil rights action seeking additional privileges. In analyzing Sweet's complaint, we

> recognize[d] that the conditions of solitary or segregated confinement must be measured against what the Supreme Court has termed "the evolving standards of decency that mark the progress of a maturing society" and that the orthodox terms in this area of the law, such as

"barbarous" and "shocking to the conscience," must take into account and be given effect in the light of the changing concepts of civilized conduct and treatment.

*Id.* at 860 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). We held with respect to all of Sweet's claims except one,[2] that his loss of privileges as a result of being placed in segregated confinement did not subject him to cruel and unusual punishment.

■ We cannot distinguish this case from *Breeden* and *Sweet*. The same legal proposition is involved. Allgood's allegations of loss of recreation and canteen privileges in protective segregation can hardly be considered "barbarous," "shocking to the conscience," or contrary to "the evolving standards of decency that mark the progress of a maturing society." *Id.* We hold, therefore, that protective segregation for a prisoner seeking protection from physical harm does not violate the Eighth Amendment prohibition of cruel and unusual punishment.

### IV.

Allgood's remaining contentions lack merit. For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

For reasons initially advanced by Judge Craven in his dissent in *Breeden v. Jackson,* 457 F.2d 578, 581, 582 (4th Cir.1972)[1] and instructively and persuasively elaborated by Judge Butzner in his special concurrence (in which Judge Craven and Judge Winter joined) in the *en banc* decision in *Sweet v. South Carolina Department of Corrections,*

---

2. Sweet's claim that he was denied adequate exercise time was remanded for the taking of additional testimony to determine whether indefinite·limitation on exercise was harmful to his health and, therefore, amounted to "cruel and unusual" punishment. *Sweet,* 529 F.2d at 865–66. That is not Allgood's claim. At oral argument, Allgood explained that his complaint is that he must exercise alone, not that he is denied an opportunity to exercise.

1. "Since the alternative was alleged to be personal injury and possible death, I think he was given no real choice."

529 F.2d 854, 866, 868 (4th Cir.1975),[2] I conclude that to equate the opting for protective segregation by a prisoner in reasonable apprehension for his physical safety, when that is the only proffered alternative, to a choice "at his own request" is to misuse language.[3]

To punish someone through withdrawal of substantial amenities where he had violated no institutional rules and the motivating consideration was solely dangerousness of other prisoners, he not being dangerous to them, is to infringe the Eighth Amendment guarantees against cruel and unusual punishment. The offer by the prison authorities to Allgood of protective segregation with its resulting loss of human contact and of recreation and canteen privileges as the only way in which he could escape bestial behavior towards him by cellmates cannot properly suffice as a discharge of the responsibilities of penal officers.

The present case differs from *Breeden* and *Sweet* in the not-insignificant respect that Allgood stuck out the dangers of his cell assignments rather than go into solitary.[4] I certainly would not *extend* the holdings in *Breeden* and *Sweet* to bar an action to correct, or to secure adequate compensation for, having had to endure what is manifestly more serious than protective custody in terms of danger of physical abuse. Serious physical abuse was actual, not merely theoretical, in Allgood's case. Breeden and Sweet avoided physical harm at the cost of loss of other valuable attributes of life. Allgood did not make the same "choice" as to which of the inevitable losses to endure that Breeden and Sweet made, but no one can reasonably fault him, since

who is to say which loss produces, for a particular individual, the greater distress. The point simply is that a civilized society should not restrict a prisoner to two such inadequate and unsatisfactory alternatives.

At the very minimum, the case should be reversed and remanded so that the facts might be investigated as to the presence, or lack, of other alternatives than the draconian two presented to Allgood. Accordingly, I dissent.

---

2. "... a preference for solitary confinement over the probability of death is not a real choice."

3. Indeed, while the style of the case indicates that Richard F. Allgood is the plaintiff, it would be more realistic to indicate that Hobson is actually the one here involved.

4. For purposes of disposition at the summary judgment stage, Allgood had established that: (1) From early June, 1981 until a culminating treble stabbing by a fellow inmate on October 1, 1981, Allgood had made, to no avail, re-

peated requests for transfer out of cell block units to which he had been assigned. (2) Allgood was the only white prisoner, the other eleven being black. (3) He received numerous threats of physical harm, the origins for which lay in racial animus. (4) During that period, Allgood rejected the "solution" of protective segregation.

Following the stabbing, Allgood apparently finally appreciated which was the lesser of the evils, and which was the greater, for he then acquiesced in protective segregation.